UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

REBECCA RICCIUTI,                      :
                         Plaintiff,    :
                                       :
        v.                             :        No. 3:09cv826 (MRK)
                                       :
GARRY GYZENIS,                         :
EMILE GEISENHEIMER,                    :
DAVID SMITH,                           :
LAWRENCE MOON,                         :
EDWARD KRITZMAN,                       :
ROBERT NOLAN, and                      :
TOWN OF MADISON,                       :
                        Defendants.    :

## MEMORANDUM OF DECISION

Plaintiff Rebecca Ricciuti alleges that the Defendants—the Town of Madison, its acting Chief of Police, and members of its Police Commission—fired her from the Madison Police Department because she spoke out against its spending and scheduling practices. Invoking 42 U.S.C. § 1983, Ms. Ricciuti claims that the Defendants unlawfully retaliated against her for speech that was made as a citizen and protected by the First Amendment.

The Defendants have moved for summary judgment, arguing that Ms. Ricciuti's speech was not protected since it was made as an employee addressing private workplace grievances. Defendants further claim that Ms. Ricciuti would have been fired even had she not spoken out, and that her speech was more disruptive than valuable. Finally, the individual defendants claim qualified immunity, arguing that their conduct was not prohibited by clearly established law at the time of Ms. Ricciuti's termination.

On the record currently before it, the Court finds that Ms. Ricciuti's speech was protected under the First Amendment, that the law clearly established this in 2009, and that the Defendants'

affirmative defenses hinge on questions of material fact that remain in dispute. For those reasons, explained more fully below, Defendants' Motion for Summary Judgment [doc. # 49] is DENIED.

## I.

Summary judgment is appropriate only when the Court, after considering depositions, documents, affidavits, interrogatory answers, and other exhibits in the record, *see* Fed. R. Civ. P. 56(c), and resolving "all ambiguities and draw[ing] all permissible factual inferences" in favor of the party opposing summary judgment, *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008), determines that "the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The burden is on the moving party—here, the Defendants—to demonstrate that no genuine dispute exists as to any material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25 (1986). "A dispute regarding a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Williams v. Utica Coll. of Syracuse Univ.*, 453 F.3d 112, 116 (2d Cir. 2006) (quotation marks omitted). "The substantive law governing the case will identify those facts that are material, and '[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.'" *Bouboulis v. Transp. Workers Union of Am.*, 442 F.3d 55, 59 (2d Cir. 2006) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

## II.

To read the parties' statements of facts in this case is already to suspect that summary judgment is not to be. As the Plaintiff would have it, this case is about an experienced officer who was disgusted by the misuse of public funds at the Madison Police Department ("MPD"), and who decided to speak up as a town resident and taxpayer. According to the Defendants, this

case was brought by a complaining, often insubordinate probationary officer who thought she knew better than her superiors how to run the Department. Ms. Ricciuti maintains that she was retaliated against for speaking out as a citizen on a matter of public concern; the Defendants counter that her speech, which violated the MPD's Code of Conduct, was intended only to improve Ms. Ricciuti's own employment conditions.

The parties agree at least on this much. Ms. Ricciuti began working for the Madison Police Department in January 2008, after working for the previous four years as a patrol officer in South Windsor. Once she completed two weeks of field training, Ms. Ricciuti was assigned to the midnight-to-8:00am shift at the MPD. Ms. Ricciuti's private journal entries reveal that she distrusted and disliked colleagues and superiors at the MPD from her second month on the job.

In June 2008, Ms. Ricciuti asked a lieutenant about purchasing equipment for the MPD and was told that the budget would not allow it. To solve the budget shortfall, Ms. Ricciuti drafted a revised shift schedule which would have saved money by eliminating what she saw as unnecessary supervisor overtime. Ms. Ricciuti claims the lieutenant responded by saying that scheduling was none of her business and that he needed the extra overtime money to "pad" his pension.

Scheduling also came up in a meeting involving Ms. Ricciuti, her colleague Scott Pardales, and Robert Nolan, who had been appointed interim Chief of Police for the MPD on June 1, 2008. Chief Nolan asked Ms. Ricciuti and Mr. Pardales if they would research ways to modify the MPD schedule to please more officers and cut overtime costs. In response, Ricciuti and Pardales created the "New Schedule Proposal," *see* Memorandum in Opposition [doc. # 59-8] Ex. 24, a slide presentation detailing possible changes to the MPD's overall schedule,

including the length of shifts, the number of days on and off, and overtime. Mr. Pardales presented an edited version of this document to Chief Nolan in the summer of 2008.

By the end of January 2009, Ms. Ricciuti and Mr. Pardales had prepared a second document, the so-called "Overtime Matrix," which focused on supervisors' schedules, the number of vacant supervisor shifts per week, and the costs incurred by Madison as a result of avoidable overtime payments. There is a dispute in the record as to whether the information in the matrix was confidential or publically accessible. *Compare* Motion for Summary Judgment [doc. # 49-14] Ex. I (Pardales Dep.) at 17, 54, 68, *with* Mem. in Opp. [doc. # 58-10] Ex. 9 (Ricciuti Interview Tr.) at 23, 52, 54, *and id.* Ex. 16 (Lewis Aff.) ¶ 21.

Regardless, Ms. Ricciuti shared the matrix with people both inside and outside the MPD. She showed it to her father and stepmother. She copied it and gave it to an MPD dispatcher after a conversation they had about mismanagement at the Department. She and Mr. Pardales provided an edited version to Madison First Selectman Al Goldberg and Madison Board of Finance Member Jennifer Tung. She emailed it to a family friend and former town official, Michael Haynes, expressing her hope that it would "open[] the door to this scam." Mot. for Summ. J. [doc. # 49-30] Ex. W. Finally, she called Walter Lippman—a Madison resident, vocal critic of the MPD, and frequent attendee of Police Commission meetings—and gave him a copy of the matrix, asking him to keep it to himself. Although Ms. Ricciuti had not known Mr. Lippman before they met on February 19, 2009 to discuss the MPD, she had seen his appearances at Police Commission meetings and wanted to provide him with the matrix before he attended the next scheduled meeting. Ms. Ricciuti's information supplemented that which Mr. Lippman had obtained on his own through Freedom of Information requests.

On February 27, 2009, Chief Nolan emailed everyone at the MPD to remind them of their duties to follow MPD Standards of Conduct, particularly those regarding Malicious Gossip, Divulging Information, and Dissemination of Information. The Standards prohibit, among other things, criticizing other members of the MPD and divulging information regarding official MPD business without authorization from the Chief.

In March 2009, Chief Nolan initiated an internal affairs ("IA") investigation of Ms. Ricciuti, led by Lt. Allen Gerard. The record is murky as to the reason Ms. Ricciuti's IA was launched. Chief Nolan has testified that he ordered Lt. Gerard to investigate three issues: 1) Ms. Ricciuti's abrasiveness; 2) problems she may have had with her supervisors; and 3) reports from Ms. Ricciuti's former employer that had not been disclosed at the time she was hired. Lt. Gerard testified that he was assigned to investigate Ms. Ricciuti because "[t]here was a matrix that was out in the public" and there were blogs and emails circulating that were critical of the MPD. Mem. in Opp. [doc. # 58-3] Ex. 2 (Gerard Dep.) at 18-19. According to Lt. Gerard, he was charged with determining whether the matrix was connected to the criticisms on the internet, whether it was completed on MPD time, and whether it contained confidential information.

In April 2009, Ms. Ricciuti was transferred to the day shift, as she had long desired. By the month's end, however, Chief Nolan advised Ms. Ricciuti to report to his office with her union representative to review and discuss a Probationary Performance Plan. This meeting was held on May 1, 2009. Chief Nolan told Ms. Ricciuti during the meeting that aspects of her job performance needed improvement. The Performance Plan, drafted by the Police Commission, would have required Ms. Ricciuti to undergo a psychological examination and to cease criticizing MPD officers, cease being disrespectful to superiors, and cease "making allegations concerning corruption within the Madison Police Department other than when making a formal

charge through the . . . chain of command." Mot. for Summ. J. [doc. # 49-42] Ex. FF (Probationary Performance Plan).

The meeting on May 1 concluded with the understanding, on both sides, that further discussions and possible revisions to the Performance Plan would occur. A second meeting was scheduled for May 7. Ms. Ricciuti and her union representative attended that meeting, along with Chief Nolan and a lieutenant whom Ms. Ricciuti disliked and distrusted. Ms. Ricciuti told Chief Nolan that she was uncomfortable having their conversation in the lieutenant's presence. Here, however, the parties' stories diverge. Ms. Ricciuti and her union representative both report that they left the May 7 meeting thinking that Chief Nolan was going to ask the Police Commission if someone besides the lieutenant could attend another meeting the following day. Chief Nolan says that Ms. Ricciuti refused to discuss or sign the Performance Plan and unilaterally terminated the May 7 meeting. He describes Ms. Ricciuti's behavior during that meeting as "blatantly insubordinate," "rude, demanding and disrespectful." Mot. for Summ. J. [doc. # 49-48] Ex. LL (Nolan Aff.) ¶ 18.

Chief Nolan says that he reported Ms. Ricciuti's behavior to the Police Commission on May 8, at which time the Commission voted unanimously to terminate her employment with the MPD. Chief Nolan's affidavit avers that Ms. Ricciuti's "disregard for the Department's chain of command . . . alone was ample ground" for her termination, and further, that "it is [his] understanding that this conduct was the primary basis for her termination." *Id*. The Commission did not invite Ms. Ricciuti to its meeting, and the Commission's letter of termination provides no reason for its decision.

## III.

A plaintiff who brings a First Amendment retaliation claim must show three things in order to survive summary judgment. She must offer evidence (1) that she "engaged in protected First Amendment activity"; (2) that she "suffered an adverse employment action"; and (3) that "there was a causal connection" between the two. *Dillon v. Morano*, 497 F.3d 247, 251 (2d Cir. 2007). If the plaintiff establishes a *prima facie* retaliation claim, "a government defendant may still receive summary judgment if it establishes its entitlement to a relevant defense." *Anemone v. Metro. Transp. Auth.*, 629 F.3d 97, 114 (2d Cir. 2011). Here, the Defendants have raised two relevant defenses. The first—known as the *Mt. Healthy* defense—allows a government employer to avoid liability if it can show that it would have fired the employee even in the absence of the protected speech. *See Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 285-86 (1977); *Anemone*, 629 F.3d at 115. The second, so-called *Pickering* defense provides a way for the government to escape liability by demonstrating that the plaintiff's expression was likely to cause a disruption to government activities that outweighs the value of her expression. *See Pickering v. Bd. of Educ.*, 391 U.S. 563 (1968); *Anemone*, 629 F.3d at 115.

Since all are agreed that Ms. Ricciuti suffered an adverse employment action, the Defendants are left with four routes to summary judgment. They could prove as a matter of law that Ms. Ricciuti's speech was not protected under the First Amendment. They could show that Ms. Ricciuti has not offered enough evidence to convince a reasonable jury that she was fired because of the matrix. They could demonstrate that no factual dispute exists as to whether the MPD would have terminated Ms. Ricciuti even if she had not created and distributed the matrix. Or, finally, they could establish that, on the record before the Court, Ms. Ricciuti's speech was indisputably more disruptive than valuable.

The Defendants have marshaled all four of these arguments. Thus, in the sections that follow, the Court considers each in turn.

## A.

The threshold question in any First Amendment retaliation case is whether the speech that allegedly prompted the retaliation counts as speech that the First Amendment protects. Not everything public employees say in the workplace constitutes protected speech. Were that the case, government offices would soon cease to function. "[V]erbal tumult, discord, and even offensive utterance" may be constitutionally valued in the public sphere, *Cohen v. California*, 403 U.S. 15, 24-25 (1971), but they are hardly the mark of a well-functioning bureaucracy, able to serve the public. *See Waters v. Churchill*, 511 U.S. 661, 672 (1994); *Connick v. Myers*, 461 U.S. 138, 149 (1983) ("[T]he First Amendment does not require a public office to be run as a roundtable for employee complaints over internal office affairs.").

At the same time, "a citizen who works for the government is nonetheless a citizen." *Garcetti v. Ceballos*, 547 U.S. 410, 419 (2006). "[P]ublic employees do not surrender all their First Amendment rights by reason of their employment." *Id.* at 417. As the Supreme Court emphasized in *Garcetti*, "The First Amendment limits the ability of a public employer to leverage the employment relationship to restrict, incidentally or intentionally, the liberties employees enjoy in their capacities as private citizens." *Id.* at 419. In other words: "the First Amendment protects a public employee's right, in certain circumstances, to speak as a citizen addressing matters of public concern." *Id.* at 417.

The Second Circuit has explained that *Garcetti* parsed this slogan into two separate inquiries: "(1) whether the subject of the employee's speech was a matter of public concern and (2) whether the employee spoke 'as a citizen' rather than solely as an employee." *Jackler v.*

*Byrne*, 658 F.3d 225, 235 (2d Cir. 2011). Both questions must be settled in order to determine whether particular speech is protected under the First Amendment. And both are questions of law, suitable for resolution at the summary judgment stage. *See id.* at 235, 237. Were the Court to determine either that Ms. Ricciuti's speech concerned a private matter, or that it was spoken solely in her role as an employee, summary judgment for the Defendants would follow.

### 1.

"'Whether or not speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record.'" *Sousa v. Roque*, 578 F.3d 164, 175 (2d Cir. 2009) (quoting *Connick v. Myers*, 461 U.S. 138, 147-48 (1983)). In requiring this holistic approach, the Second Circuit has made clear that a speaker's motivations do not alone determine whether speech counts as public or private.[1] As the Second Circuit wrote in *Sousa v. Roque*, someone "who complains solely" about her dissatisfaction with conditions at work "is speaking upon matters only of personal interest," yet "it does not follow that a person *motivated by* a personal grievance cannot be speaking on a matter of public concern." *Id.* at 174. Applied in the present context, this means that Ms. Ricciuti's speech cannot be categorized as personal simply because it was connected to, arose from, or even was motivated by her many grievances with conditions at the MPD. The Court must look more closely at the "content, form, and context" of her speech to determine whether its concern was public. *Id.* at 175.

---

[1] In particular, *Sousa v. Roque* made clear that the proper understanding of motivations was *not* the one expressed in *Ruotolo v. City of New York*, 514 F.3d 184, 189 (2d Cir. 2008), a case on which the Defendants rely. *Compare* Defs.' Mem. in Supp. [doc. # 49-1] at 20, *with Sousa*, 578 F.3d at 173.

Beginning with content: once the Court resolves ambiguities and draws all permissible factual inferences in Ms. Ricciuti's favor, *see Holcomb,* 521 F.3d at 137, the record indicates that Ms. Ricciuti's speech was about the mismanagement of taxpayer funds at the Madison Police Department. Ms. Ricciuti has testified and produced other evidence that schedules were being manipulated and town funds were being wasted so that senior officers at the MPD could increase their overtime pay and "pad" their pensions. *See* Mot. for Summ. J. [doc. # 49-21] Ex. N at 1. These allegations involve public concerns—indeed, paradigmatically public ones. *See Garcetti*, 547 U.S. at 425 ("Exposing governmental inefficiency and misconduct is a matter of considerable significance."); *Jackler*, 658 F.3d at 236 ("Exposure of official misconduct, especially within the police department, is generally of great consequence to the public." (quotation marks omitted)); *id.* at 236-37 (including "preservation of the public fisc" as a reason why exposure of police malfeasance is "plainly a matter of public concern"); *Bieluch v. Sullivan*, 999 F.2d 666, 671 (2d Cir. 1993) (tax expenditures and town budgets are "matters of utmost public concern").

*Sousa* holds that, in addition to content, the form and context of an employee's speech is relevant in determining public versus private concern. However, those considerations are even more central to the second question the Court must ask: whether the speech was made as an employee or as a citizen. Since the Second Circuit has instructed that, after *Garcetti*, "we must shift our focus from the content of the speech to the role the speaker occupied when he said it," *Weintraub*, 593 F.3d at 204 (quotation marks omitted), the Court finds that Ms. Ricciuti spoke on a matter of public concern and turns to the more difficult question of whether the form and context of her speech suggests that Ms. Ricciuti spoke as a police officer or as a citizen.

## 2.

"[W]hen public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Garcetti*, 547 U.S. at 421. The plaintiff in *Garcetti*—the case that established this principle—was a deputy district attorney whose speech consisted of a "memo that addressed the proper disposition of a pending criminal case." *Id.* at 422. Because "the memo was written pursuant to [the plaintiff's] official duties," *id.* at 421, it was not protected under the First Amendment. As the Supreme Court put it, writing memos was "part of what he . . . was employed to do." *Id.*

On its way to this holding, the Supreme Court offered several relevant considerations. First, the plaintiff's speech had been "commissioned" by his employer. *Id.* at 422. Second, the plaintiff did not engage in speech—like the letter to the editor at issue in *Pickering*, 391 U.S. 563—similar to that of regular citizens. *Garcetti*, 547 U.S. at 422. His was not "the kind of activity engaged in by citizens who do not work for the government." *Id.* at 423 (including political discussions with co-workers as its other example of ordinary citizen speech). Third, the parties in *Garcetti* did not dispute that the plaintiff wrote his memo "pursuant to his employment duties." *Id.* at 424.

The Court finds that each of these considerations points in Ms. Ricciuti's favor. First, while Chief Nolan "commissioned" Ms. Ricciuti's initial research into MPD scheduling, the matrix had a different focus—supervisors and their schedules—and was made almost entirely on Ms. Ricciuti's own time and on her own initiative. Second, Ms. Ricciuti discussed the matrix with co-workers at the MPD as well as with her family, a family friend, local officials, and even a concerned citizen who was preparing to appear at a Police Commission hearing. Talking

politics with co-workers and preparing questions to be asked at a town meeting undeniably count as the kinds of activities engaged in by "regular citizens." Finally, the parties here sharply dispute the issue of whether Ms. Ricciuti spoke pursuant to her employment duties. Unlike in *Garcetti*, then, Defendants here are not able to win by stipulation.

By its own admission, however, *Garcetti* is not the final word on the speech of public employees. *See id.* at 424 ("We thus have no occasion to articulate a comprehensive framework for defining the scope of an employee's duties in cases where there is room for serious debate."). Acknowledging this, the Second Circuit offered further guidance on the subject in *Weintraub v. Board of Education*, 593 F.3d 196 (2d Cir. 2010), a case brought by a public school teacher who was terminated after he complained about the way his school's administrators handled student discipline. Mr. Weintraub's complaints took a number of forms: a personal conversation with his superior, conversations with other teachers, and a formal grievance filed with his union. *See id.* at 199-200. Notably, the district court denied summary judgment to the defendants on the second category of speech, finding that conversations with other teachers were "clearly not within the scope of his employment duties." *Id.* at 200 (quoting *Weintraub v. Bd. of Educ.*, 489 F. Supp. 2d 209, 220 (E.D.N.Y. 2007)). On appeal, Mr. Weintraub's union grievance was the only speech considered by the Second Circuit, which held that his grievance was made "pursuant to his official duties and thus not as a citizen." *Id.* at 201.

In reaching its decision, the Second Circuit expanded upon several of the characteristics of employee speech noted in *Garcetti*. First, to count as employee rather than citizen speech, it must be made "in furtherance of one of" the employee's "core duties." *Id.* at 198. This category extends beyond speech made at the behest of the employer; it encompasses speech that is "part-and-parcel" of an employee's ability to properly execute his or her duties. *See id.* at 203.

Second, the speech must have "no relevant analogue to citizen speech." *Id.* at 198; *see also Jackler*, 658 F.3d at 237 ("As a rule of thumb, activities required of the employee as part of his employment duties are not performed 'as a citizen' if they are not 'the kind of activity engaged in by citizens who do not work for the government.'" (quoting *Garcetti*, 547 U.S. at 423)). In addition to *Garcetti*'s examples of ordinary citizen speech—letters to newspapers and conversations with co-workers—the Second Circuit added a third example: complaints made to elected representatives or an independent state agency such as an Inspector General. *See id.* at 204. These, the court said, are "channels available to citizens generally"—unlike union grievances, which are part of a dispute resolution process arising only through an agreement between a union and the employer. *Id.*

Third, the Second Circuit noted a distinction between *Weintraub* and *Cioffi v. Averill Park Central School District Board of Education*, a pre-Garcetti opinion. *See* 444 F.3d 158 (2d Cir. 2006). In *Cioffi*, a school's athletic director had written to the school board to criticize the district's handling of a hazing incident. The speech at issue in that case was publicly disclosed, the athletic director went on to discuss the matter in a press conference, and the "public's interest in receiving [his] well-informed views . . . was strong." *Weintraub*, 593 F.3d at 204-05 (quotation marks omitted). "In contrast," the Second Circuit wrote—identifying the relevant difference between the cases—Mr. Weintraub "never communicated with the public." *Id.* at 205.

As before, the Court finds that each of these distinctions points in Ms. Ricciuti's favor. In all three instances, Ms. Ricciuti falls on the protected side of *Weintraub*'s fence.

The first—and most difficult—question is whether Ms. Ricciuti's speech was "part-and-parcel" of her ability to carry out her job duties as a police officer. *See id.* at 203. Consider Mr. Weintraub, by way of comparison. As a teacher, his job was in part to maintain discipline in the

classroom, which he thought could only be accomplished if administrators disciplined the students he sent to them. When administrators failed to do this, Mr. Weintraub filed his complaint with the union, a step he saw as necessary to carrying out his job.

At first glance, Ms. Ricciuti's speech might seem to have a similar aim. Clearly, she thought that her scheduling ideas, if enacted, would improve the MPD. A more efficient and better-resourced MPD would undoubtedly help Ms. Ricciuti carry out her job. But this argument proves too much. Were "part-and-parcel" to encompass all speech that aims to improve a government employee's workplace—thereby helping the employee carry out her core duties there—everything that employees say relating to their work would end up falling outside the First Amendment's protections. This would fly in the face of the Supreme Court's repeated reminders that government employees' speech is often most valuable when it concerns a subject they know best: their jobs. *See, e.g.*, *Garcetti*, 547 U.S. at 421 ("The First Amendment protects some expressions related to the speaker's job."); *Pickering*, 391 U.S. at 572 ("Teachers are, as a class, the members of a community most likely to have informed and definite opinions as to how funds allotted to the operations of the schools should be spent. Accordingly, it is essential that they be able to speak out freely on such questions without fear of retaliatory dismissal.").

The difference between this case and *Weintraub* is that discipline was one of Mr. Weintraub's job responsibilities in a way that scheduling or budgeting, for Ms. Ricciuti, were not. Better scheduling and budgeting might have helped Ms. Ricciuti in her job, but they were not themselves part of her job. Thus, the Court finds that Ms. Ricciuti's speech was not made pursuant to, or "part-and-parcel" of, her duties as a police officer.

The *Weintraub* court's other distinctions provide further support for this conclusion. By explicitly distinguishing complaints to elected representatives, *see Weintraub*, 593 F.3d at 204,

the Second Circuit seems to have envisioned a case like Ms. Ricciuti's, in which she approached members of the Madison Board of Finance, a Town Selectman, and—by proxy, through Walter Lippman—the Police Commission. The fact that Ms. Ricciuti was utilizing "channel[s] of discourse available to non-employee citizens," *id.*, is unusually clear in this case, since Mr. Lippman, a non-employee citizen, was using similar channels to lodge largely the same complaints about the MPD. Here, the citizen-speech analogue to Ms. Ricciuti's speech is more than a hypothetical.

Finally, Ms. Ricciuti went public with her concerns, thereby bringing her case closer to *Cioffi* than *Weintraub*. The parties do not dispute that Ms. Ricciuti spoke about scheduling and overtime at the MPD with her parents, former and current town officials, and a "well-known local gadfly." *See* Defs.' Mem. in Supp. [doc. # 49-1] at 8; Defs.' Rule 56(a)1 Statement of Facts [doc. # 49-2] ¶ 58. The Court finds it especially significant that several of these people appear to have taken an interest in what Ms. Ricciuti had to say. This is important not only because *Weintraub* includes "the public's interest in receiving the well-informed views of . . . a government employee" as a factor favoring protection. *Weintraub*, 593 F.3d at 205; *see also City of San Diego v. Roe*, 543 U.S. 77, 82 (2004) ("The interest at stake is as much the public's interest in receiving informed opinion as it is the employee's own right to disseminate it."). Considering the public interest in an employee's speech also helps to guard against a danger that government employees will feel tempted to "go public"—an easy thing to do in an age of blogs and social media—every time they lodge a complaint or criticism at work.

Given *Garcetti*'s concern with workplace order and discipline, it would be odd if its holding rewarded precisely those employees who took their complaints furthest outside the chain of command. *See Thompson v. District of Columbia*, 530 F.3d 914, 918 (D.C. Cir. 2008) ("[I]t

would be incongruous to interpret *Garcetti*, a case concerned with allowing the government to control its employees within their jobs, as giving broader protections to disobedient employees who decide they know better than their bosses how to perform their duties."); *cf. Anemone*, 629 F.3d at 116 ("When a government employee concededly engages in speech pursuant to his official duties, the fact that he persists in such speech after a supervisor has told him to stop does not, without more, transform his speech into protected speech made as a private citizen."). Emphasizing public interest does not eliminate this concern, but it lessens it by only incentivizing employees to go public if there is a receptive and interested audience for their speech. The Court does not read *Weintraub* as rewarding those who go public merely to gain protection, using publicity as a kind of First Amendment insurance policy. In any case, Ms. Ricciuti is not in this latter camp; the record, viewed in her favor, suggests that Ms. Ricciuti's speech found an eager audience in the Town of Madison, and that reaching this audience was her goal.

In sum: because Ms. Ricciuti's speech was made on her own initiative and mostly outside of work, because it did not concern her duties as a police officer, because it took a form analogous to that of other citizens in town, and because it was addressed to an interested public, the Court concludes that Ms. Ricciuti spoke as a citizen rather than a public employee when she wrote and distributed her matrix.

**B.**

That threshold crossed, the remaining issues can be disposed of more quickly, as all are heavily fact-dependent, and the facts are just as heavily contested. The first question is why Ms. Ricciuti was fired. This inquiry takes two forms. First, as part of Ms. Ricciuti's *prima facie* retaliation case, she has the burden of showing a causal connection between her protected speech

and her termination. If she carries this burden, the Defendants can respond with the affirmative defense that they would have fired her even if she had not spoken as she did. The first of these claims is considered in this section, the second claim in the section to follow.

A plaintiff alleging retaliation on the basis of protected speech "bears the initial burden of showing that an improper motive played a substantial part in the defendant's action." *Anemone*, 629 F.3d at 114 (citation omitted). Demonstrating causation requires more than "conclusory assertions of retaliatory motive." *Deters v. Lafuente*, 368 F.3d 185, 190 (2d Cir. 2004). The plaintiff "must aver some tangible proof demonstrating that [the] protected [activity] animated [the adverse employment decision]." *Washington v. Cnty. of Rockland*, 373 F.3d 310, 321 (2d Cir. 2004). A plaintiff may establish causation "either indirectly by means of circumstantial evidence, for example, by showing the protected activity was followed by adverse treatment in employment, or directly by evidence of retaliatory animus." *Morris v. Lindau*, 196 F.3d 102, 110 (2d Cir. 1999); *see also Smith v. Da Ros*, 777 F. Supp. 2d 340, 355-56 (D. Conn. 2011).

On the record currently before the Court, the cause of Ms. Ricciuti's termination remains unclear. The basic timeline is undisputed, however: Ms. Ricciuti distributed her matrix in January 2009; an IA was launched against her in March 2009; on May 1, 2009, Chief Nolan presented Ms. Ricciuti with a Performance Plan and gave her time to consider it; on May 7, 2009, she and the Chief had a second meeting to discuss the Plan; the following day, Ms. Ricciuti received notice of her termination.

Evidence presented thus far suggests that these events may well have been connected. Lt. Gerard, who led Ms. Ricciuti's IA, has testified that the investigation was launched because of "a matrix that was out in the public." Mem. in Opp. [doc. # 58-3] Ex. 2 (Gerard Dep.) at 18. The Performance Plan itself seems to have referenced the matrix when it required Ms. Ricciuti to

"[c]ease making allegations concerning corruption with the Madison Police Department." Mot. for Summ. J. [doc. # 49-42] Ex. FF (Probationary Performance Plan). Chief Nolan has testified that Ms. Ricciuti refused to discuss or sign the Performance Plan, that he reported this to the Police Commission, and that the conduct he reported "was the primary basis for her termination." *Id*. [doc. # 49-48] Ex. LL (Nolan Aff.) ¶¶ 17-18; *see also id.* ¶ 19 ("Based on my report, and plaintiff's refusal to cooperate in any way in regard to the Probationary Performance Plan, the Police Commission voted unanimously to terminate plaintiff's probationary employment with the Department.").

A reasonable jury could decide that the matrix led to the IA which resulted in the Performance Plan which precipitated Ms. Ricciuti's termination: in other words, that Ms. Ricciuti's protected speech caused her to be fired. Of course, another reasonable jury might find otherwise. The point is that this material factual question remains in dispute. Whether or not Ms. Ricciuti has established the third element of her *prima facie* retaliation case will have to be answered at trial.

## C.

"[E]ven if there is evidence that the adverse employment action was motivated in part by protected speech, the government can avoid liability if it can show that it would have taken the same adverse action in the absence of the protected speech." *Anemone*, 629 F.3d at 114 (quotation marks omitted); *see also Mt. Healthy*, 429 U.S. 274. The Supreme Court's analysis in *Mt. Healthy* "attempts to weigh the impact of the defendant's *impermissible* reason on the defendant's decision to act, such that a defendant can avoid liability by showing that it would have taken the same action in the absence of the impermissible reason." *Anemone*, 629 F.3d at 115 (emphasis in original). "[A]t this stage of the proceedings, [the Defendants] are entitled to

summary judgment if they can show that a reasonable jury would have to find by a preponderance of the evidence" that they would have fired Ms. Ricciuti "even had they not learned of her . . . speech." *Nagle v. Marron*, --- F.3d ----, No. 10-1420-cv, 2011 WL 6142196, at *9 (2d Cir. Dec. 12, 2011).

The Defendants claim that Ms. Ricciuti's conduct at the May 7 meeting with Chief Nolan—her alleged refusal to discuss the Performance Plan, her rude and insubordinate behavior, her attempt to dictate which of her superiors could attend, and, finally, her walking out of the meeting—itself provided an adequate and legitimate ground for termination. Noting that Ms. Ricciuti's Performance Plan would have required her to undergo a psychiatric evaluation, the Defendants cite *Kaytor v. Electric Boat Corp.*, a Second Circuit case in which an employee was fired for insubordination after refusing to schedule a psychiatric evaluation her company had demanded. *See* 609 F.3d 537, 554 (2d Cir. 2010). In *Kaytor*, the plaintiff's retaliation claim failed because the company's stated reason for terminating her—insubordination—was found to be genuine.

Significantly, however, in *Kaytor*, it was clear that the company had good reason to order the psychiatric evaluation in the first place. In other words, the demand which the employee was insubordinately resisting was not itself prompted by retaliatory motives. *See id.* ("The district court found Electric Boat's proffer ample to show a non-retaliatory reason—Kaytor's repeated exhibition of signs of paranoia—for ordering the independent psychiatric examination and for terminating her employment because of her refusal to do so, and we agree.") In the present case, a reasonable jury could find that the MPD's demands were not so innocent.

If the MPD's investigation of Ms. Ricciuti and the resulting Performance Plan were forms of retaliation against Ms. Ricciuti's protected speech—as hotly disputed evidence in the current

record suggests—then Ms. Ricciuti's refusal to sign the Performance Plan could not have constituted an independent, non-retaliatory justification for her termination. The proposed Performance Plan itself required Ms. Ricciuti to cease engaging in the speech at issue here. *See* Mot. for Summ. J. [doc. # 49-42] Ex. FF (Probationary Performance Plan). A government employer that fires someone for refusing to acquiesce in her own silencing cannot then go on to say that the cause of the termination was insubordination, not speech.

A reasonable jury could conclude on the evidence currently before the Court that had the MPD never learned of Ms. Ricciuti's protected speech, the whole chain of events that led to her insubordination would have never occurred. Similarly, a jury might find that the legitimate concerns about Ms. Ricciuti offered by the Defendants were pretextual, or were not weighty enough to have led the MPD to fire her. In the end, too much is disputed or unknown at this point about what went on at the meeting on May 7 and at the Police Commission meeting that followed.

As the Second Circuit recently wrote in a strikingly analogous context:

> While it is certainly possible that an employee's behavior at a single meeting can be so egregious as to merit dismissal, we do not think that crying and leaving the room to calm down suffices, as a matter of law, to overcome a *prima facie* showing of retaliation. The record raises genuine issues of material fact as to why Appellees acted as they did, and summary judgment is precluded where questions regarding an employer's motive predominate in the inquiry regarding how important a role the protected speech played in the adverse employment decision.

*Nagle*, 2011 WL 6142196 at \*10 (quotation marks and alterations omitted). Because questions about their motives remain, the Defendants have not shown that they are entitled to summary judgment on the basis of their *Mt. Healthy* defense**.** Whether Ms. Ricciuti's alleged behavior was sufficient cause for her termination is thus another question to be decided at trial.

**D.**

The Defendants' second affirmative defense turns on what is known as the *Pickering* balancing test, *see Pickering*, 391 U.S. 563 (1968), which asks whether a plaintiff's speech would likely have proven more disruptive than valuable. To avoid liability through this route, the Defendants have to establish that: (1) they reasonably predicted the disruption Ms. Ricciuti's speech would cause the MPD; (2) the potential disruption outweighed the value of the speech; and (3) Ms. Ricciuti was fired because of the disruption, not in retaliation for the speech itself. *See Johnson v. Ganim*, 342 F.3d 105, 114 (2d Cir. 2003). Applying this three-factor test is "as a general rule . . . a matter of law," but the Second Circuit has also "envision[ed] cases in which the question of the degree to which the employee's speech could reasonably have been deemed to impede the employer's efficient operation would properly be regarded as a question of fact, to be answered by the jury prior to the [district] court's application of the *Pickering* balancing test." *Id.*

Like the Defendants' *Mt. Healthy* defense, the *Pickering* balancing in this case turns out to be deeply fact dependent. The Defendants claim that Ms. Ricciuti's matrix was "biased, incomplete and inaccurate"—and thus almost completely void of social value. Defs.' Mem. in Supp. [doc. # 49-1] at 29. Unsurprisingly, Ms. Ricciuti disputes these characterizations, and she has provided evidence that the MPD has successfully adopted several of her ideas since terminating her. *See* Mem. in Opp. [doc. # 58-11] Ex. 10 (Lippman Aff.), ¶¶ 12-14. Just as the value of Ms. Ricciuti's speech remains contested, so too does its disruptiveness. For example, the parties dispute whether Ms. Ricciuti included confidential information in the matrix. *Compare* Mot. for Summ. J. [doc. # 49-14] Ex. I (Pardales Dep.) at 17, 54, 68, *with* Mem. in Opp. [doc. # 58-10] Ex. 9 (Ricciuti Interview) at 23, 52, 54, *and id.* Ex. 16 (Lewis Aff.) ¶ 21. If she did disseminate confidential information, the disruption caused by her speech would obviously be

much greater than if the information was already available to the public. This material dispute cannot be settled on the record currently before the Court.

*Pickering* balancing is a particularly inappropriate ground for summary judgment in this case because the disruptiveness and the value of Ms. Ricciuti's speech cannot be weighed independently here. Importantly, *Pickering* looks to the disruption caused to the *proper* functioning of a government office. *See Pickering*, 391 U.S. at 570. But Ms. Ricciuti claims that she was trying to disrupt the *improper* functioning of the MPD. *Cf. Jackler*, 658 F.3d at 237 ("[I]f the allegations of internal misconduct are indeed true, [the employee's] statements could not have adversely affected the *proper* functioning of the department since the statements were made for the very reason that the department was not functioning properly." (quotation marks omitted, emphasis in original)). Were Ms. Ricciuti's critique valid—that is, were her speech found to be valuable—it could not be considered disruptive since it actually would have helped improve MPD operations. In this, Ms. Ricciuti's speech is different from those cases where the speech in question—such as a policeman's racist rant, *see Pappas v. Giuliani*, 290 F.3d 143 (2d Cir. 2002)—has nothing to do with the functioning of the employee's office. In those cases, unlike this one, the value of the speech and its disruptiveness to the office can be weighed separately.

The Court notes one final consideration supporting Ms. Ricciuti. The Second Circuit has held that a government employer's interest in controlling employees' speech is more weighty when the employees are high-ranking. A public employer is "not required to retain in a management or policymaking position a person who publicly opposes its policies." *Faghri v. Univ. of Conn.*, 621 F.3d 92, 97 (2d Cir. 2010). The fact that Ms. Ricciuti had no management or

policymaking duties and, in fact, held the lowest-ranking position in the MPD therefore cuts in her favor.

Viewing the facts in the light most favorable to Ms. Ricciuti, a jury could easily find that Ms. Ricciuti's speech was more valuable than disruptive to the MPD. If her allegations of corruption and mismanagement at the MPD were accurate, her speech would not have been disruptive at all, in the sense relevant under *Pickering*. This question too will have to be decided at trial.

## IV.

In addition to their two affirmative defenses on the merits, the individual Defendants—though not the Town of Madison, *see Jackler*, 658 F.3d at 244 ("There is no tradition of immunity for municipal corporations." (quotation marks omitted))—claim that the doctrine of qualified immunity shields them from liability for Ms. Ricciuti's termination.

"The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). "Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Id.*

As the Second Circuit wrote recently, "[q]ualified immunity depends on whether, '[t]aken in the light most favorable to the party asserting the injury, . . . the facts alleged show the [official's] conduct violated a . . . right,' and, if so, whether that right was 'clearly established' at

the time of the events at issue." *Nagle*, 2011 WL 6142196 at *11.[2] The Court has already concluded that the facts alleged by Ms. Ricciuti—when viewed in her favor, as they must be at this stage—establish a violation of her rights under the First Amendment. Because this conclusion is so heavily fact dependent, it may have to be revisited once the jury sorts out the facts at trial. For now, the remaining and somewhat difficult question is whether the right to engage in speech like Ms. Ricciuti's without retaliation by a government employer is a right that was clearly established in May 2009.

"The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable [official] that his conduct was unlawful in the situation he confronted.'" *Id.* (quoting *Saucier v. Katz*, 533 U.S. 194, 202 (2001)). "The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987).

---

[2] There is no small irony in the fact that the Second Circuit's qualified immunity case law is itself not "clearly established." As matters currently stand, it is unclear whether district courts are meant to ask three questions or just two when determining whether qualified immunity obtains. *Compare X-Men Sec., Inc. v. Pataki*, 196 F.3d 56, 65-66 (2d Cir. 1999) (offering three questions: Was the conduct illegal?; Was the illegality clearly established?; and Was the conduct "objectively legally reasonable"?), *and Taravella v. Town of Wolcott*, 599 F.3d 129, 135 (2d Cir. 2010) (describing "why this third question is indispensable"), *with Walczyk v. Rio*, 496 F.3d 139, 166-67 (2d Cir. 2007) (Sotomayor, J., concurring) ("Contrary to what our case law might suggest, the Supreme Court does not follow this 'clearly established' inquiry with a second, *ad hoc* inquiry into the reasonableness of the officer's conduct."), *and Nagle*, 2011 WL 6142196 at *12 ("[A]n official 'who violates clearly established law necessarily lacks an objectively reasonable belief that his conduct was lawful.'" (quoting *Okin v. Village of Cornwall-On-Hudson Police Dept.*, 577 F.3d 415, 433 n.11 (2d Cir. 2009) ("We clarify here that the two [questions] are part of the same inquiry, not independent elements as some cases suggested."))). Not knowing how to reconcile these two lines of cases, the Court will follow the Second Circuit's more recent guidance and use the two-part test employed in *Nagle*—itself a First Amendment retaliation case. In any event, the third question of the three-part test is not answerable at this point, given the disputed facts that remain in this case. *See Taravella*, 599 F.3d at 135.

   Case 3:09-cv-00826-MRK   Document 65   Filed 12/28/11   Page 25 of 28

In *Jackler v. Byrne*, the Second Circuit held that in January 2006, when the plaintiff in that case was terminated, "it had been clearly established that the First Amendment protected . . . a government employee, including a police officer, speaking as a citizen on a matter of public concern, against retaliation for that speech except where the government's interest in the agency's proper functioning outweighed the employee's First Amendment right." *Jackler*, 658 F.3d at 243. This right, the court added, "has been clearly established since at least 1968." *Id.* (quotation marks omitted).

That said, the Defendants rightly note one major occurrence between Mr. Jackler's termination and Ms. Ricciuti's: the Supreme Court's decision in *Garcetti*. According to the Defendants, "[i]n the post-*Garcetti* era, courts have gradually broadened the constraints on employee conduct including speech." Defs.' Mem. in Supp. [doc. # 49-1] at 32. This claim finds support in *Weintraub*, which described *Garcetti* as "narrowing the [Supreme] Court's jurisprudence in the area of employee speech by further restricting the speech activity that is protected." *Weintraub*, 593 F.3d at 201 (quotation marks omitted); *but see id.* at 205 n.1 (Calabresi, J., dissenting) ("*Garcetti* did not overturn or even call into question any of the Court's prior precedents on employee speech."). Defendants argue that since Ms. Ricciuti was terminated prior to *Weintraub*'s clarification of *Garcetti*, this Circuit's law on the subject was not yet clearly established.

Further complicating the question is an unpublished Second Circuit opinion issued in June 2010, *Drolett v. DeMarco*. *See* 382 F. App'x 7 (2d Cir. 2010) (summary order). In *Drolett*, a police officer who "had a duty to raise his concerns about the management of the police department within the chain of command" instead did so outside the chain of command. *Id.* at 8. According to the Second Circuit:

> Had [the plaintiff] raised his concerns within the chain of command, that speech likely would have been made 'pursuant to [his] official duties,' and therefore not protected by the First Amendment. The courts have yet to consider whether speech that would not enjoy First Amendment protection if made pursuant to an official duty can claim such protection when made in violation of that duty.

*Id.* (quoting *Garcetti*, 547 U.S. at 421). Concluding that the plaintiff's rights were not clearly established at the time he was disciplined, the Second Circuit found the defendants to be immune from suit. *See id.* at 8-9.

The Court acknowledges the strength of these considerations favoring qualified immunity but, ultimately, remains unconvinced by them. For one thing, a glance back at the Court's earlier discussion of protected speech shows that however else *Garcetti* may have narrowed employees' First Amendment protections, it does not seem to have affected Ms. Ricciuti. Even if *Garcetti* shifted courts' focus from the content of speech to the role played by the speaker, *see Weintraub*, 593 F.3d at 204, this Court had little trouble determining that Ms. Ricciuti's role in distributing the matrix was that of citizen. As *Garcetti* itself had noted: "The First Amendment limits the ability of a public employer to leverage the employment relationship to restrict, incidentally or intentionally, the liberties employees enjoy in their capacities as private citizens." *Garcetti*, 547 U.S. at 419. The distinctions the Court drew earlier between this case and *Garcetti*—in particular, the fact that the matrix was not commissioned by the MPD and that Ms. Ricciuti's speech was analogous to that of other Madison residents at the time—show that, as applied to Ms. Ricciuti, *Garcetti* did little to muddy the previous four decades of First Amendment case law.

In one respect, the Second Circuit's case law may have been even clearer in 2009 than it is today. Aside from qualified immunity, the toughest question confronting the Court in this opinion has been whether *Weintraub*'s "part-and-parcel" language should be read to extend to

speech, like Ms. Ricciuti's, that was not part of her job but which may have improved the conditions in which she performed her job. For the reasons given previously, the Court believes that "part-and-parcel" cannot extend this far. Here, the point is simply that government officials in 2009, pre-*Weintraub*, would not have even needed to ask this question. The Court finds it notable that the Defendants do not point to any specific cases besides *Garcetti* that might have caused them, in 2009, to doubt what the law required of government employers in regard to their employee's First Amendment rights.

Finally, the Court hesitates to give weight to the Second Circuit's unpublished opinion in *Drolett* precisely because it is unpublished. In fact, in *Jackler*, decided a year after *Drolett*, the Second Circuit cautioned district courts against doing that very thing. *See Jackler*, 658 F.3d at 244. Even summary orders that "would seem to require the conclusion that the defendants are qualifiedly immune" do not do so, the court held, because summary orders do not have precedential effect. *Id.* As the *Jackler* court explained, this is because summary orders do not provide enough facts for courts to determine whether later cases are analogous or distinguishable. *See id. Drolett* itself provides a good illustration of this problem. While the language of its holding would seem to apply well to the present case, the Court cannot be sure exactly how the plaintiff in *Drolett* "raised his concerns outside the chain of command." *Drolett*, 382 F. App'x at 8. Perhaps he did so without going public, or employing channels of communication used by private citizens, or finding an interested audience. If so, his case would prove distinguishable from Ms. Ricciuti's, and the Second Circuit's conclusion that the law was unclear as to situations like Mr. Drolett's would not necessarily apply to situations such as hers. Because *Drolett* was not published as a precedential opinion, it cannot be the basis for qualified immunity in this case.

The Court concludes that the law was sufficiently clear in 2009 that a government employer should have known that it could not fire an employee because she spoke out as a citizen about a matter of public concern. The individual Defendants' claims of qualified immunity are therefore denied. Whether or not the Defendants did, in fact, fire Ms. Ricciuti because she spoke out as a citizen about a matter of public concern is a question that the Court leaves for the jury.

**V.**

At trial, the jury will need to decide:

1) whether Ms. Ricciuti's protected speech led to her termination;

2) whether the MPD would have fired Ms. Ricciuti even in the absence of her protected speech; and

3) whether the value of her protected speech outweighed the disruption it would have caused to the proper functioning of the MPD.

Because these questions of material fact remain in dispute, Defendants' Motion for Summary Judgment [doc. # 49] is DENIED.

**IT IS SO ORDERED.**

 /s/  Mark R. Kravitz_____
United States District Judge

**Dated at New Haven, Connecticut: December 28, 2011.**